UNITED STATES of America,
Plaintiff-Appellee,

v.

James Arthur CHARLTON,
Defendant-Appellant,

Franklin N. Jacek, a/k/a Frank Royce,
Defendant-Appellant,

James Francis Swartz,
Defendant-Appellant.

Nos. 76–1454 to 76–1456.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 30, 1976.

Decided Oct. 21, 1977.

Rehearing Denied Dec. 7, 1977.

Gene A. Stanley, Jr., Knoxville, Tenn. (court-appointed), for defendant-appellant in No. 76–1454.

John L. Bowers, U. S. Atty., Edward E. Wilson, Richard K. Harris, Asst. U. S. Attys., Knoxville, Tenn., for plaintiff-appellee.

Philip P. Durand, Ambrose, Wilson, Lockridge & Grimm, Knoxville, Tenn. (court-appointed), for defendant-appellant in No. 76–1455.

Edward Michael Ellis, Knoxville, Tenn. (court-appointed), for defendant-appellant in No. 76–1456.

Before PHILLIPS, Chief Judge, and EDWARDS and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

This is an appeal by three defendants convicted of forging and counterfeiting fifty-cent postage stamps worth approximately $200,000, in violation of 18 U.S.C. §§ 501 and 2.[1] Of the numerous grounds asserted for reversal, only one merits extended treatment. Defendant James Arthur Charlton claims that in-custody oral statements given to the government agents on the evening of his arrest were made involuntarily. We hold that Charlton's statements, while voluntary under traditional tests, were taken in violation of the specific proscriptions of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and should not have been admitted into evidence against him. Nevertheless, we hold that the introduction of those statements was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Charlton was arrested without a warrant at his home shortly after 10:00 p. m. on June 25, 1975. Earlier that evening special

---

1. 18 U.S.C. § 501 states in relevant part:

   Whoever forges or counterfeits any postage stamp, postage meter stamp, or any stamp printed upon any stamped envelope, or postal card, or any die, plate, or engraving thereof; or

   Whoever makes or prints, or knowingly uses or sells, or possesses with intent to use or sell, any such forged or counterfeited postage stamp, postage meter stamp, stamped envelope, postal card, die, plate, or engraving; . . . shall be fined not more than $500 or imprisoned not more than five years, or both.

88

agents of the United States Secret Service, pursuant to a search warrant, entered offices rented by Charlton at 214 East Harper Street in Maryville, Tennessee, and seized large quantities of the counterfeit stamps and the paraphernalia for manufacturing them. Upon his arrest, Charlton was taken to the courthouse in Knoxville, Tennessee, where he was fingerprinted and otherwise processed in connection with his arrest. Approximately two hours later he was fully advised of his constitutional rights. He declined to sign a written waiver of those rights and instead responded that he wanted an attorney. He expressed no desire to talk to the agents. However, they questioned him, for only a short period apparently, in spite of his request. Shortly after 1:00 a. m. Special Agent MacVean Sweazey came into the room and said, "Well, got your son up here. What are you going to do about that?" Charlton did not answer Sweazey immediately, but the officer persisted with words to the effect that "if you want to keep your son, Mark, out of the case, he is (sic you are) going to have to explain how he was (sic you were) involved and show how Mark could be all around the counterfeiting operation and not know about it."

Thereafter Charlton made the incriminating statements which were later introduced into evidence. The interrogation continued until about 3:00 a. m. No attorney was ever procured and Charlton refused to sign a written statement concerning the counterfeiting operation.

At a pretrial suppression hearing Charlton readily admitted that he had understood his rights, but claimed that he had been fatigued because the hour was late and he had worked all of the previous day in his employment as a draftsman for the Tennessee Valley Authority. In answering a question on direct examination as to whether he made the statement to the government of his own free will, Charlton stated:

A. I talked to the postal inspector and Mr. Sweazey. I told them I would talk to them but the only thing, clear

everybody out of the room and what I was going to say would be off the record.

Q. Listen to my question. Did you speak to them of your own free will?
A. Not really. It wasn't, not in the way you put it. In other words—
They actually got me mad because they kept hinting to the fact I didn't care anything about my son, and they actually used my son until they got me mad, really.

On cross examination Charlton basically repeated the story and explained:

Well, they had stopped, this was about an hour later when they came back into the room and they said that my son had made a statement to them and that (sic) I want to help him. That is when they started using my son and that's when they got me mad, when they started using my son.

Charlton further claimed that the statement he gave was entirely fictitious.

At the conclusion of the hearing, the trial judge ruled:

I hold that this statement can go to the jury, everything that was said there. There was no coercion, this man's coercion, that's—well, there isn't any basis for you saying that, Counsel, according to his own testimony. He said he was mad.

Charlton's testimony concerning the circumstances of his interrogation was unrefuted. The government called no witnesses.

The issue of voluntariness of a confession is a mixed question of fact and law. *United States v. Brown,* 557 F.2d 541, 547 (6th Cir. 1977). The applicable standard is whether the confession was the product of a free and rational choice, and therefore the focus is upon the state of mind of the accused at the time the confession was made. In *Brown,* we quoted from *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961):

The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred

years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

557 F.2d at 546. *See United States v. Washington*, 431 U.S. 181, 186, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977).

■ Upon our examination of the record and according appropriate deference to the trial judge's superior opportunity to observe the demeanor of the witnesses, we conclude that in the traditional sense Charlton's statements were voluntary. There was no lengthy period of detention or repeated rounds of interrogation. There was no indication of any physical abuse. Charlton was informed of his constitutional rights and obviously understood them. He was not an impressionable youth, nor was he lacking in intelligence. *See Schneckloth v. Busta-monte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

We have little doubt that the defendant was ultimately persuaded to testify by his anger at discovering that his twenty-year old son, Mark, had also been arrested. It was apparent at the suppression hearing and at the trial that the defendant was highly protective of Mark. Obviously anyone who knows his rights and determines to confess does so for a reason. That the defendant's reason was to protect his son does not, in our judgment, render his confession involuntary or necessitate a finding that he was coerced or that his will was overborne.

Of considerably greater difficulty is whether, although otherwise voluntary, Charlton's statement must nevertheless be suppressed because the government agents persisted in questioning him after he had declined to talk and had requested counsel. Defendant relies upon the following language in *Miranda, supra,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28:

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

(footnote omitted).

■ While the traditional determination of voluntariness had largely turned on a case-by-case consideration, *Miranda* required exclusion of any statements stemming from custodial interrogation unless the prosecution demonstrated compliance with its specific, prophylactic safeguards. Thus, if law enforcement officers fail to give the specified warnings before interrogation or fail to follow its guidelines during interrogation, the statement derived therefrom may be suppressed, even though it is otherwise "wholly voluntary." *Michigan v. Mosley,* 423 U.S. 96, 99–100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Michigan v. Tucker,* 417 U.S. 433, 443, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

■ In *Michigan v. Mosley, supra,* police questioning was held proper even though the accused had earlier indicated his desire to remain silent. There the Supreme Court rejected a strict rule which would totally preclude all further custodial interrogation. At the same time it observed that to con-

strue *Miranda* to require only the immediate cessation of questioning would permit a resumption of interrogation after a momentary respite, which would undermine the will of the accused:

> Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

> A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . ." 384 U.S., at 479 [86 S.Ct., at 1630]. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." *Id.,* at 474 [86 S.Ct., at 1628]. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

423 U.S. at 102–04, 96 S.Ct. at 326 (footnotes omitted).

Turning to the facts here, Charlton declined to discuss the counterfeit operation, but the agents continued to question him for a presumably short period. Without giving further warnings, the agents later induced him to speak by stressing his son's precarious position if he remained silent. Charlton obviously did not succeed in persuading them to keep his statements "off the record." [2]

As for Charlton's request for counsel, the Supreme Court in *Michigan v. Mosley* explicitly noted that the case did not present the question of what procedures were required where such a request was made. However, in a concurring opinion, Justice White explicitly opined that whatever might be the propriety of resuming questioning after an accused had expressed a desire to remain silent, if an attorney was also requested, *Miranda* created a *per se* rule against further interrogation until the attorney was in fact present, thus precluding a waiver. 423 U.S. at 109–110, 96 S.Ct. 321.

In spite of the literal language from *Miranda,* and of Justice White's observations about it, the prevailing conclusion among the courts of appeals is that a waiver is possible even after counsel has been requested. *See, e. g., United States v. Grant,* 549 F.2d 942, 945 n.4 (4th Cir. 1977); *United States v. Pheaster,* 544 F.2d 353, 367–68 (9th Cir. 1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546; *United States v. Womack,* 542 F.2d 1047, 1050 (9th Cir. 1976); *Biddy v. Diamond,* 516 F.2d 118, 122 (5th Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976).

In *United States v. Dority,* 487 F.2d 846 (6th Cir. 1973), we upheld the admission of a confession on the basis of a waiver by the defendant of the right to counsel. At the time federal agents sought to question him, the defendant was jailed on unrelated state charges. He did not request an attorney and proceeded to sign a waiver form, but unknown to the interrogating officers, the accused already had an appointed counsel acting for him in connection with the state offenses. The officers did not notify the attorney of the new federal charge before taking a statement. *Accord, United States v. Daniels,* 528 F.2d 705, 707 (6th Cir. 1976).

---

**2.** There is no evidence that any of the officers ever promised such confidentiality to his statements. The rights which *Michigan v. Mosley* commands be "scrupulously honored" do not in our judgment include a right to control the use of a statement which is otherwise voluntarily given with full knowledge of its potential incriminatory value.

But, in *Combs v. Wingo,* 465 F.2d 96 (6th Cir. 1972), cited by defendant Charlton, our circuit took a stricter approach and found a violation of *Miranda* by the admission in a Kentucky state criminal trial of the defendant's confession made when counsel had been requested but not furnished. There, after indicating he wished an attorney, the defendant was shown the ballistic report on a rifle and bullet which allegedly had been used in the murder, whereupon he broke down and confessed. Concluding that the statement violated the *Miranda* guidelines, our court agreed with the dissenting judges in the Kentucky Court of Appeals that the act of showing the ballistic reports to the defendant was essentially a form of continued interrogation, the only possible object of which was to break down the defendant's will and elicit the confession.

In the recent case of *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 53 L.Ed.2d 240 (1977), the defendant had been induced by the importunities of the law enforcement officers to reveal the whereabouts of his murder victim's body while being transported between two Iowa cities. The defendant already had an attorney but was separated from him during the trip with the express understanding that no questioning would take place in his absence.

In affirming the decision of the Eighth Circuit striking down the conviction, the majority declined to determine if the *Miranda* guidelines were violated and relied solely instead upon a denial of the Sixth Amendment right to counsel. It emphasized that a waiver was permissible, but only if the prosecution had proved "an intentional relinquishment or abandonment of a known right or privilege" under *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Applying that standard and indulging in every reasonable presumption against waiver, the Supreme Court concluded that the record fell far short of sustaining that burden, even though Williams was informed of his rights and appeared to understand them.

In *Brewer v. Williams* the defendant had already consulted his counsel following arrest and was formally arraigned. In contrast, defendant Charlton had no opportunity to receive initial advice of an attorney upon his express request, and the alleged waiver occurred only a short time after warnings were given and before any contact with the judicial system. Because of the differences in the factual pattern presented here, it is not clear from *Brewer v. Williams* that the Court would reject a *per se* rule under the literal language of *Miranda.* We need not decide that question here, because we conclude that the government failed to show a valid waiver in any event.

Under the strict standard of *Johnson v. Zerbst,* the mere demonstration that the confession came without objection after a resumption of questioning is inadequate evidence of waiver. We conclude that the defendant here did not knowingly and intelligently waive his right to counsel. He refused to sign a waiver of rights and expressly requested counsel. He had initially refused to talk about the counterfeiting operation, but was questioned anyway. The information about Charlton's son was clearly presented in a coercive manner without warnings being given again. It cannot be said upon the record here that the officers scrupulously honored Charlton's decision to remain silent and to see an attorney. A heavy burden was upon the government and it was not met.

### HARMLESS ERROR

At oral argument of this case the government urged for the first time that even if the confession given by Charlton violated his rights under *Miranda,* its admission under these circumstances was harmless beyond a reasonable doubt within the meaning of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Chapman* a majority of the Supreme Court held that consistent with its earlier position in *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963):

> [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless

beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case.

386 U.S. at 24, 87 S.Ct. at 828 (footnote omitted).

At the same time, the Court observed in *Chapman* that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." 386 U.S. at 23, 87 S.Ct. at 827–28. It cited as an example *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), wherein the admission of a plainly coerced and involuntary confession was held to require a new trial. There the Court held that "even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment." 356 U.S. at 568, 78 S.Ct. at 850.

While other decisions of the Supreme Court have held that the admission of an involuntary confession commands reversal regardless of other evidence of guilt, *see, e. g., Haynes v. Washington,* 373 U.S. 503, 518, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Lynumn v. Illinois,* 372 U.S. 528, 537, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), at least one recent decision has apparently applied the harmless error rule in the context of an alleged involuntary confession. *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). There, at petitioner Milton's state murder trial, the prosecution introduced evidence of his admissions and statements made to a police officer named Langford, who had gained his confidence while posing as a cell mate. At the time, Milton was represented by appointed counsel in the pending proceeding. The Court assumed arguendo that the statements were involuntary under Fifth Amendment

standards. However, it found their admission was harmless beyond a reasonable doubt, especially noting that the overwhelming evidence included no less than three full and validly obtained confessions. Of interest, the dissenting justices, while disputing the appropriateness of application of the harmless error rule on the facts, did not claim that it was unavailable, because of the nature of the constitutional violation.

On the other hand, our circuit, without expressly addressing the issue, has rather consistently applied the *Chapman* rule where otherwise appropriate, if the constitutional error involved the admission of confessions secured in violation of the *Miranda* guidelines, though otherwise voluntary under the traditional analysis. *See, e. g., United States v. Eagleton,* 437 F.2d 451, 452 (6th Cir. 1971); *Whitsell v. Perini,* 419 F.2d 95, 96 (6th Cir. 1969); *United States v. Smith,* 418 F.2d 223, 224 (6th Cir. 1969). *Cf. Hayton v. Egeler,* 555 F.2d 599, 603 (6th Cir. 1977); *Minor v. Black,* 527 F.2d 1, 5 (6th Cir. 1975), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1198 (1976).

While *Miranda* and the decisions which follow it are premised upon constitutional considerations, there are differences between those confessions which are inherently coercive and which have been traditionally stricken as lacking in voluntariness and those which, though otherwise voluntary, have failed to comply with the strict procedural requirements of *Miranda. See Smith v. Estelle,* 527 F.2d 430 (5th Cir. 1976).

We are not required to reach the question of what circumstances, if any, allow the application of the harmless error rule in *Chapman v. California* where the confession is coerced and violates traditional standards of voluntariness. It is sufficient here to hold that where a confession, otherwise voluntary, is inadmissible for failure to comply with the strict procedural requirements of *Miranda,* reversal is not required if, upon the facts, the court can find beyond a reasonable doubt that its use at trial was harmless and could not have affected the outcome. We see no reason why in such circumstances the court may

not weigh the therapeutic benefits of *Miranda* against the very real burden upon the system and the parties of requiring a new trial where the issue could never seriously be in doubt.

 Applying the *Chapman* harmless error rule here, we conclude that there is no reasonable doubt either of Charlton's guilt or the fact that conviction would as surely have followed had his statements not been received. The evidence was overwhelming.

Charlton's involvement was shown by extensive physical and testimonial evidence that directly implicated him in the counterfeiting operation. Secret Service Agent Semansky, who executed the search of the East Harper Street building, testified that several thousand sheets of the counterfeit stamps were seized as well as the press, hole perforator, plates, and other paraphernalia used in their production. Charlton's fingerprints were found on some of those stamps and plates, and there was no doubt that he fully controlled the premises on East Harper Street. Although Charlton's son had technically rented the building, the second installment of rent had been paid by the DBD Corporation, controlled and formed by Charlton. Numerous suppliers of materials and equipment testified that Charlton had made purchases. Charlton's own son testified to his discovery and knowledge of bags of stamps and plates on the premises several weeks earlier and was once asked to leave by his father as he approached the operating machinery. Co-defendant Howie, after pleading guilty, testified to Charlton's involvement and to the arrangement by which the anticipated proceeds were to be divided.

On the other hand, testimony concerning the incriminating statement, while received at trial, was not unduly emphasized. The statement included an admission by Charlton of his involvement in the illegal operation, but also contained at least a feeble effort to establish a defense of duress. If not very credible, it appears to have been the only defense which Charlton was able to pursue at the trial and his counsel at least made an effort to present it through cross-examination. Charlton did not himself testify.

 Numerous other assertions of error are made with respect to all three defendants. Upon an examination of the entire record, the court finds that the district court did not err, upon the facts before it, in refusing an evidentiary hearing concerning allegations of omissions of material facts by the government agents in preparing the affidavit in support of the search warrant.

Likewise, the trial court did not err in refusing to suppress and exclude evidence obtained by the search warrant, as we find without merit the appellants' claim that the facts set forth in the affidavit were insufficient to establish probable cause. Also, contrary to the claims of the appellants, the district court fairly instructed the jury on all the applicable issues. Finally, the court did not err in denying appellant Swartz's application for a continuance, and as to him there was ample evidence to support the jury verdict finding him guilty.

The court being of the opinion that in all other respects the defendants received a fair trial, free from any prejudicial error, the judgment of the district court is affirmed.