611 P.2d 1036

The STATE of Idaho,
Plaintiff-Respondent,

v.

Louis Andrew MONROE,
Defendant-Appellant.

No. 12532.

Supreme Court of Idaho.

May 15, 1980.

Rehearing Denied June 30, 1980.

William F. Gigray, III of Gigray, Miller, Downen & Weston, Caldwell, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Howard Carsman, Deputy Attys. Gen., Boise, for plaintiff-respondent.

BISTLINE, Justice.

The defendant-appellant, Louis Andrew Monroe, here appeals his conviction, on January 17, 1977, of first degree murder, based on two assignments of error: first, the admission of evidence seized as a result of the entry by police officers of the defendant's home early on the morning of June 12, 1976; and second, the admission of a confession given by the defendant that same morning.

I.

On June 12, 1976, at approximately 3 a. m., Canyon County Sheriff's Department and firemen responded to a call reporting a car on fire in a church parking lot on Sunnyridge Road south of Nampa. While the firemen were putting out the blaze they observed a body in the trunk of the vehicle. Sergeant Roy Mullen radioed the dispatcher and summoned the investigator on call, the sheriff, the coroner, and the prosecuting attorney. The license plate on the car was checked and the owner was listed as Lee Monroe, who was reported to live less than half a mile from the parking lot. Lee Monroe had five days earlier reported a burglary of his home to the sheriff's office.

After Detective Anderson, Dr. Donndelinger, Prosecutor James Morfitt, and several sheriff's office personnel arrived at the scene, Anderson instructed Sergeant Mullen and Officer Stout to proceed to the Monroe residence. Mullen and Stout found the house almost completely lit and the interior visible from the outside, since there were no curtains drawn except for one bedroom, which was dark. From the street they could see no movement or anything else of interest on the inside. Outside near the back of the house, however, they observed a smoldering object which appeared to be a mattress. The two officers proceeded to circle the outside of the house in opposite directions. Mullen examined the mattress in the rear of the house, and observed a piece of fabric on top of it, considerably burned. He also observed at the back door bloodstains and the signs that a body might have been taken out the back door. Mullen met Stout at the front of the house and told him not to enter the house; Mullen then returned to the parking lot to confer with other officers. Sheriff Nourse, on his way to the parking lot, stopped at the Monroe

residence and was briefed by Officer Stout, who was then told to secure the area.

At the parking lot the body was further examined and a spent .22 caliber projectile found. It was also learned that the Monroe residence was rented from the Stuarts, who lived next door. Morfitt drove to the Stuart residence; he awakened them and asked them to help identify the body. When Mr. Stuart left with Prosecuting Attorney Morfitt to go to the parking lot, Nourse and Detective Prescott proceeded to the Monroe residence. Stout reported that he had seen and heard nothing since Mullen left. The officers knocked loudly at both the front and back doors and announced themselves, but got no answer. They then obtained a key from Mrs. Stuart and let themselves in. After looking briefly at the lighted rooms they knocked on the one bedroom into which they had not been able to see from the outside, and entered, finding the defendant on the bed, apparently asleep. They woke him and told him to get up and get dressed and talk to them in the living room.

There is some conflict at this point between the testimony of Sheriff Nourse and Detective Prescott. Nourse testified at the preliminary hearing that he noticed guns in the bedroom and warned the other officers to be aware of that. Nourse testified that the defendant responded by pointing to a .22 rifle in the closet—in plain view—and stating, "That is the only gun you will need." Deputy Prescott, on the other hand, testified that this statement came only after the defendant had been taken into the living room and then went back to the bedroom to get some different clothes.

In any event, the defendant was brought into the living room, advised of his *Miranda* rights, and asked whether he wanted to make a statement. He said that he thought he should see a lawyer before making a statement. The defendant was then placed under arrest and told to get his clothes. When Prescott noticed bloodstains on the clothes defendant had put on, he asked whether he had worn them the day before; defendant said yes, and the clothes were confiscated.

Defendant was handcuffed and searched and again asked whether he wanted to make a statement, and he again said that he would after he had been advised by his attorney. At approximately 6:30 a. m. the defendant was transported to the Canyon County Sheriff's Office, Criminal Investigation Division (CID).

Detective Anderson and Prosecuting Attorney Morfitt then discussed the need for a search warrant to photograph the inside of the house and collect evidence. Anderson then proceeded to photograph the outside of the house.

Jim Muller, another occupant of the Monroe residence, returned home at approximately 8 a. m. and found several police cars outside, and several officers inside the house. He was informed of the events and was transported at about 8:30 to the CID, where the defendant was being held.

In the meantime, at approximately 5:30 a. m. a Sheriff's deputy went to the home of Vernita Monroe (the defendant's mother who lived separately from her husband and son), awakened her, and asked her to come down to the CID. There she talked with Officer Prescott and was told that her husband was dead and that the officers suspected foul play. She was then told for the first time that her son might be involved, and that he was being held upstairs. Mrs. Monroe's testimony, uncontroverted as we read the record, is as follows:

(Mrs. Monroe): ". . . He [Prescott] said he wanted me to talk to Andy and see if I could get Andy to talk to them because he wouldn't talk to them.

"Q. Are you sure that is what he asked you?

"A. Yes. I said, 'Well, I cannot afford to hire an attorney for Andy.' I said, 'He is entitled to an attorney, isn't he?' And Prescott said, 'Yes, we will get him an attorney.' And I said, 'Well, shouldn't he have a right to an attorney before he is questioned?' And he said, 'Well, it would make it a lot simpler if we

could get him to talk to us.' And he said would I talk to Andy and see if I could get Andy to talk to them."

After the defendant had had some conversation with his mother, Detective Prescott asked if he were ready to give a statement. He said, "I want a lawyer before I talk to you." Detective Anderson entered the room shortly thereafter, and asked if the defendant would talk. The defendant said he would, and began asking Anderson why Muller, whom he could see just outside the room where he was being questioned, was there. Anderson testified as follows:

"I told him that we were going to be talking to everybody that was remotely involved in this situation and he indicated that Mr. Muller did not know anything about it, did not have anything to do with it; something of that nature, and I then asked him if he would like to give me his side of it or what did take place and he said, 'Yes.' "

Anderson later testified that he was not aware that the defendant had previously requested an attorney.

Defendant then executed a full written *Miranda* waiver and was interviewed by Anderson, first informally, and then on tape (Exhibit 13). He confessed to shooting his father on the morning of June 11, and that evening putting the body in the car, and finally setting the car on fire. Thereafter the defendant was arraigned on charges of first degree murder. At 10 a. m. on June 12 Sheriff Nourse filed an affidavit in support of a warrant to search the Monroe residence. The warrant was issued and served on Muller at the Monroe residence at 11:30 a. m. A variety of items were then seized, photographed and inventoried, including clothes belonging to the defendant stained with blood and a .22 caliber rifle (the murder weapon).

The defendant moved to suppress all of the evidence which had been obtained as a result of the warrantless search, and also to suppress the confession as both a fruit of the search, and as a violation of 5th and 6th Amendment rights. The trial judge denied the motion to suppress except with respect

to the clothing which Officer Prescott had questioned the defendant about before taking him to the stationhouse.

## II.

■ The first question raised in this appeal is whether the warrantless entry and search of the home of the defendant was reasonable, and therefore permissible under the Fourth Amendment. As the appellant has pointed out, warrantless searches are *per se* unreasonable, unless they fall within one of the defined exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Harwood*, 94 Idaho 615, 495 P.2d 160 (1972). Here, however, the respondent has invoked the recognized exception for emergencies or "exigent circumstances." Under this exception, in the words of Judge (now Chief Justice) Burger, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963) (Burger, J., concurring). The test to be applied in determining whether or not an emergency exists is whether the facts as then known to the police, together with reasonable inferences drawn therefrom, " 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).

■ The facts which were available to the police officers at the time they made their entry into the defendant's home were as follows: the police were confronted with a house in a quiet residential district with its lights ablaze at 4 a. m., with a mattress smoldering in the back yard, bloodstains near the back entryway, with the knowledge that a car containing an apparent murder victim had been set on fire recently in a parking lot less than a half mile away, and the car being registered to the same person, Lee Monroe, who was renting the house. Under these circumstances the police were justified in making a warrantless entry into the house in order to investigate

the possibility of additional victims, possible suicide, or other fires. While it might be argued in retrospect that immediate action was not required, "the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct." *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963) (Burger, J., concurring). We hold that the entry was reasonably made.

■ Appellant has disputed the characterization of the police action as a response to an emergency. He points out that while the police arrived at the house and conducted their initial investigation shortly after the discovery of the car in the parking lot, they delayed actual entry into the house until more than an hour later. Appellant contends that, while an entry into the house at the time of the initial investigation would have been justified, the delay of more than an hour belies the claim of emergency. However, the case authority does not support this argument. In *People v. Hill*, 12 Cal.3d 731, 117 Cal.Rptr. 393, 528 P.2d 1 (1974), for example, a homicide victim was brought to a hospital, and sheriff's deputies ·became informed of the location of the shooting. It was more than two hours later that the police conducted a warrantless search at the scene of the homicide. The California Supreme Court upheld the constitutionality of the search, noting that "[a] warrantless entry of a dwelling is constitutionally permissible where the officers' conduct is prompted by the motive of preserving life and reasonably appears to be necessary for that purpose." *Id.* 117 Cal. Rptr. at 411, 528 P.2d at 19.

■ The delay in itself is not critical, therefore; the question remains, however, whether the lapse of time meant that "immediate action" was no longer required. Where the officers could not say that anything had happened in the time since they first arrived, was there a potential risk that something might yet happen in the time it would have taken to procure a warrant? We believe the answer to that question must be in the affirmative. We agree with the statement of the trial court made in denying the motion to suppress: "[I]t wasn't until there was an accumulation of evidence that the officers really were in a position to determine that there were exigent or emergency situations possibly existing, and when they finally did act in the manner which they did I think they had not only the right to act but had a duty to enter the premises." To adopt appellant's line of reasoning would bias police decisions toward precipitate action rather than considered deliberation. In the present case, the police waited until they had verified and expanded their initially limited information; they verified the identity of the murder victim and the cause of death, they learned who else might be living in the home, and they made preparations for a more careful and less intrusive entry into the home. Police officers should be permitted to use their best judgment in deciding how to approach what may be emergency situations possibly fraught with danger to other unknown persons. While the claim of emergency must be scrutinized to insure that it is not mere pretext for entries and searches that otherwise fall under the requirement for a warrant, nonetheless courts should, as did the trial court here, avoid second-guessing police decisions made in legitimate belief that life may very well be at stake. "People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Wayne v. United States*, 318 F.2d 205, 212 (Burger, J., concurring).

### III.

The manner in which appellant's confession was obtained is more troublesome. The admissibility of confessions by criminal defendants has been in considerable turmoil since *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The last word as to the exact requirements of the United States Constitution, as interpreted by that case, has yet to be spoken, making our task no easier. However, we can at least trace the evolution of the law thus far. *Miranda* required that custodial interrogation of suspects be conducted in a manner

which respects the defendant's right to remain silent, and his right to the assistance of counsel. Its major innovation was to require that suspects be advised of their rights, and that they be able to assert those rights to potential interrogators:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." 384 U.S. at 473–74, 86 S.Ct. at 1627–28. (Footnote omitted.)

Unfortunately, however, the "subsequent procedure" has turned out to be far from "clear." Once a suspect has asserted his *Miranda* rights, may he be persuaded to waive them? The U.S. Supreme Court recently considered whether the defendant's assertion of his right to *silence* prevented any further questioning at any time. In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), a suspect was advised of his *Miranda* rights and asserted his right to silence; several hours later he was again advised of his rights and questioned about an unrelated crime. In the course of that questioning he made incriminating statements which were used against him at trial. The Supreme Court held that a literal interpretation of the instructions in

*Miranda* was impossible since it would lead to absurd results: either no questioning at any further time could be permitted, or else the interrogation could resume following only a "momentary respite." Rejecting either literal interpretation, the Court held:

"A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . .' 384 U.S., at 479, 86 S.Ct., at 1630. The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' *Id.*, at 474, 86 S.Ct., at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" 423 U.S. at 103–104, 96 S.Ct. at 326.

*Mosley* thus established that the suspect's initial invocation of the right to remain *silent* could later be waived, so long as the "right to cut off questioning" was "scrupulously honored." However, it left open the question of whether a suspect's invocation of his right to the *assistance of counsel* could similarly be waived, and whether such waiver may be prosecution-induced. In a footnote to the above quoted language in *Mosley*, the court did note:

"The dissenting opinion asserts that *Miranda* established a requirement that once a person has indicated a desire to remain silent, questioning may be resumed only when counsel is present. . . But clearly the Court in *Miranda* imposed no such requirement, for it distinguished between the procedural safeguards trig-

gered by a request to remain silent and a request for an attorney and directed that 'the interrogation must ˙cease until an attorney is present' only '[i]f the individual states that he wants an attorney.'"

*Id.* at 104 n. 10, 96 S.Ct. at 326 n. 10. And in an earlier footnote, the Court in *Mosley* reiterated the language in *Miranda* stating that when a suspect requests an attorney, "interrogation must cease until an attorney is present." 423 U.S. at 101 n. 7, 96 S.Ct. at 325 n. 7. To add further support to the inference from *Mosley* that the request for an attorney should prevent questioning until an attorney is present, Justice White in his concurring opinion states that, whereas the assertion of the right to remain silent might lapse with the passage of time, the invocation of the right to an attorney is overcome only by the provision of an attorney to the suspect:

> "The Court [in *Miranda*] showed in the very next paragraph, moreover, that when it wanted to create a *per se* rule against further interrogation after assertion of a right, it knew how to do so. The Court there said '[i]f the individual states that he wants an attorney, the interrogation must cease *until an attorney is present*.'" [Justice White's emphasis.] 423 U.S. at 109–10, 96 S.Ct. at 329 (White, J., concurring).

And in a footnote Justice White commented further:

1. A still more recent case, but one not dealing with the issue presented in the present appeal, is *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Butler was advised by FBI agents of his right to remain silent and his right to be represented by counsel, and indicated that he understood them. He declined to sign a waiver form offered to him by the agents; when advised that he need not either talk to the agents or sign the form, he said "I will talk to you but I am not signing a form." When advised of his right to a lawyer, Butler said nothing. Butler thereafter made incriminating statements which were introduced at trial. The U.S. Supreme Court reversed the ruling of the North Carolina Supreme Court that Butler's failure to given an explicit oral or written waiver of his rights precluded the finding that he had waived his rights:

"The question of the proper procedure following expression by an individual of his desire to consult counsel is not presented in this case. It is sufficient to note that the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, *a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism*." *Id.* at 110 n. 2, 96 S.Ct. at 329 n. 2. (Emphasis added.)

Despite hints in these opinions that *Miranda* should be interpreted to create a *per se* rule against the questioning of a suspect who has requested an attorney unless an attorney is present, it is by no means certain that such a rule in fact has been or will be adopted. A more recent case, involving somewhat different issues, was *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).[1] There Williams, a murder suspect, had consulted an attorney before he surrendered himself to police, and had been repeatedly advised not to talk to them. During a three-hour drive from

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." 99 S.Ct. at 1757.

*Butler* cannot control a proper resolution here simply because "[a]t no time did [Butler] request counsel or attempt to terminate the agent's questioning." *Id.* at 1756. The question before this court is whether, and under what circumstances, a suspect, *after having requested counsel*, can be said to have knowingly and intelligently waived that right.

Davenport, Iowa, where Williams was taken into custody, to Des Moines, where he was to be arraigned, Williams conversed with the arresting officers unaccompanied by his attorney. Shortly after the drive began, one of the officers made what has come to be called the "Christian burial speech," in which he pointed out that an impending snowstorm might make it difficult for the murder victim to be found and given a "Christian burial." The officer stated that he thought Williams might be able to help them with finding the victim's body, but said he didn't want Williams to answer him, but just to "think about it" while they drove. After the lapse of some time Williams asked them if they had found the victim's shoes yet, and then said he could retrieve them from a gas station where he had hid them. Some time later he told them he would lead them to the body, which he did.

The U.S. Supreme Court held that the "Christian burial speech" was a form of interrogation, and that it violated Williams' right to the assistance of counsel announced in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Again, *Williams* is somewhat different than the case at bar, since it involves the decision of a suspect to waive his right to an attorney *after* he has consulted with one, and it further involved the issue of whether Williams was being "interrogated" by police or had simply volunteered his statements and incriminating assistance. But, given the opportunity to make a definitive statement of the circumstances under which a suspect could waive his right to counsel, the Supreme Court merely said "[t]he Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." 430 U.S. at 405–06, 97 S.Ct. at 1243. (Footnote omitted.) And in the footnote the court cited cases which have adopted the *per se* rule as well as cases which have rejected it.

Of the cases in the latter category, respondent here relies upon *United States v.*

*Pheaster*, 544 F.2d 353 (9th Cir. 1976), cert. denied sub nom. *Inciso v. United States*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). Pheaster was taken into custody by the FBI, and after being advised of his *Miranda* rights requested an attorney. During the trip to the police station, FBI agents described the strength of their case against Pheaster, whereupon Pheaster acknowledged his role in the crime. The Court of Appeals for the Ninth Circuit found that Pheaster's statements to the FBI were admissible, holding that "a waiver of rights under *Miranda* can occur despite an earlier demand to have an attorney." 544 F.2d at 367–68. The court stated:

"Our examination of the record in this case has revealed that the decision regarding waiver was a close one; yet, on balance, we believe that the district court was correct in deciding that the Government had met its 'heavy burden' in establishing Pheaster's waiver. Because it was not possible for the F.B.I. agents who arrested Pheaster to provide him with an attorney at the moment that he demanded one, the key question is whether the failure of the agents to sit mute during the ride to county jail, where an attorney could be provided, mandates the exclusion of Pheaster's statements. On the particular facts of this case, we are convinced that such exclusion was not mandated."

*Id.* at 368. The holding in *Pheaster* was adopted by the Ninth Circuit sitting *en banc* in *United States v. Rodriguez-Gastelum*, 569 F.2d 482 (9th Cir.), cert. denied, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978). In that case the court found that a *per se* rule would reach too far, having the effect of "imprison[ing] a man in his privileges." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 280, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942).

While in many ways a *per se* rule would provide greater ease of administration (not requiring a case-by-case determination of whether a particular waiver was genuine), and while it would provide clear guidance to police as to what they should do once a

lawyer is requested—they should stop questioning and afford the accused the opportunity of securing an attorney—the trend seems to be against a *per se* rule. "[T]he prevailing conclusion among the courts of appeals is that a waiver is possible even after counsel has been requested." *United States v. Charlton*, 565 F.2d 86, 90 (6th Cir. 1977). Nonetheless, in order to find a waiver of the defendant's right to counsel, we must find that the defendant's right to counsel was "scrupulously honored," in an analogous fashion to the requirement in *Mosley* that the defendant's right to silence must be scrupulously honored.

## IV.

The writer of this opinion to this point is of the view that the evidence in the record cannot support the trial court's finding that the defendant "voluntarily, knowingly, and intelligently" waived his right to counsel. My view as to the admissibility of the confession is not shared by the other members of the Court, and therefore the conviction must be affirmed.

DONALDSON, Chief Justice.

■ I agree with the foregoing opinion down to Part IV where it states the confession of defendant should have been ruled inadmissible at the suppression hearing. The trial court made the factual determination essential to its ruling that the defendant's confession is admissible, and we are not at liberty to reverse that decision where the trial court's findings are supported by substantial evidence. *See State v. Warden*,

100 Idaho 21, 592 P.2d 836 (1979); *State v. Chapple*, 98 Idaho 475, 476, 567 P.2d 20, 21 (1977). Specifically the trial court found that the mother's conversation with the defendant did *not* bring about the defendant's decision to retreat from the assertion of his right to counsel and his right to remain silent. The trial court *did* find that defendant, on seeing Jim Muller, and because of seeing him, reached his own unaided determination to talk with the officers concerning his father's death. From a review of the record, the trial court also found that after the defendant indicated a desire to talk, he was once again advised of his *Miranda* warnings by the police and signed a waiver of those rights only after Officer Anderson had reviewed with him each of the items mentioned in the waiver.[2]

Concurring in Parts I, II, and III of the opinion of Justice Bistline, I am unable to concur in Part IV, and for reasons above stated I would affirm the conviction.

The judgment of conviction is affirmed.

BAKES and McFADDEN, JJ., and SCOGGIN, J. Pro Tem., concur.

BISTLINE, Justice, dissenting as to the admissibility of the confession.

In the context of the present case it is clear that, despite repeated requests for an attorney, the police neither made *any* effort to obtain one for the defendant and did not afford him any opportunity to do so; nor did they cease in their efforts to persuade him to submit to questioning in the absence of an attorney. The defendant's mother

---

2. The trial court indicated in some detail its reasons for considering Monroe's confession to be voluntary:

"I think the whole thing that triggered the confession was, as the State has indicated, the fact that the defendant viewed Mr. Muller's presence in the jail area and wanted to know why he was there and he told him he was there for questioning. I think the defendant on his own decided that he did not want him involved and that he made the decision to give the statement to the law enforcement officers. I think that (if) the law enforcement officers had gone ahead maybe at that point without again reminding him of his Miranda warnings and taking the

other precautions they did might have taken advantage of him as far as catching him in a weak moment; the fact he saw a friend and didn't want to get the friend involved.

"I think when you take the totality of the circumstances again and see that they did not immediately question him, that they again sat him down and reminded him of his rights, had him sign it with the knowledge his mother was present there and he was certainly aware of the fact that he was entitled to an attorney because he had claimed that privilege on at least three occasions, that he made the confession voluntarily and that would be my decision at this point."

was picked up by sheriff's deputies at her home at 5:30 a. m. and, without explanation, was *ordered* to accompany the officers to the stationhouse. There she was informed of her husband's murder and eventually of her son's arrest. Officer Prescott asked her to talk with the defendant because he wouldn't talk to them directly, and they hoped she might let them know what he said. Mrs. Monroe asked whether her son shouldn't have an attorney before he was questioned, but the response was that "it would make it a lot simpler if we could get him to talk to us." The defendant told his mother he would not tell her anything, because "[i]f I tell you then they can talk to you and then they could question me about it. . . . If I don't tell you anything they can't make you tell them."

The trial court found that the decisive factor in the defendant's decision to make a statement was the presence of his roommate, Jim Muller. "I think the defendant on his own decided that he did not want him [Muller] involved and that he made the decision to give the statement to law enforcement officers. I think that the law enforcement officers might have taken advantage of him as far as catching him in a weak moment; the fact he saw a friend and didn't want to get the friend involved."

The trial court found that the defendant's confession was given voluntarily; "voluntariness," however, is not the standard. The trial court's finding of "voluntariness" was a necessary but not a sufficient condition for admitting the confession:

"While the traditional determination of voluntariness had largely turned on a case-by-case consideration, *Miranda* required exclusion of any statements stemming from custodial interrogation unless the prosecution demonstrated compliance with its specific, prophylactic safeguards. Thus, if law enforcement officers fail to give the specified warnings before interrogation or fail to follow its guidelines during interrogation, the statement derived therefrom may be suppressed, even though it is otherwise 'wholly voluntary.' *Michigan v. Mosley*, 423 U.S. 96, 99–100,

96 S.Ct. 321, 324, 46 L.Ed.2d 313 (1975); *Michigan v. Tucker*, 417 U.S. 433, 443, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974)." *U. S. v. Charlton*, 565 F.2d 86, 89 (6th Cir. 1977).

The level of scrutiny required where a defendant allegedly waived rights initially asserted must be higher than the scrutiny required where a suspect never asserts those rights. As Justice White stated in his concurring opinion in *Mosley*, "[t]he accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." 423 U.S. at 110 n. 2, 96 S.Ct. at 329 n. 2. While most courts have held that it is possible for the right to counsel, even though initially asserted, to be waived "voluntarily, knowingly, and intelligently," (*Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612), it must be borne in mind that "courts indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977).

In light of this heavy burden, it is impossible for me to conclude that Monroe's waiver of his right to counsel was made "voluntarily, knowingly, and intelligently." In addition to the admission by officers that they never attempted to honor Monroe's request for counsel, it also appears that by the time the taking of his statement commenced, a magistrate should have been available in the court house. There is also the use of the defendant's mother to try to persuade him to make a statement, without having honored his request for counsel, and the trial court's finding, amply supported by the record, that the defendant's confession was triggered by the defendant's perception that his roommate was being implicated in the crime. A very strong factor militating against the waiver finding is the singular fact, unremarked upon by the trial court, that Monroe was taken out of lock-up in order that he could be exposed to the rather prolonged conversation which he had with his mother, with some regard for the additional fact that by the time of its con-

clusion, Jim Muller, too, had been brought into the custodial area.

A comparable case was presented to the New York Court of Appeals in *People v. Grant*, 45 N.Y.2d 358, 408 N.Y.S.2d 429, 380 N.E.2d 257 (1978). There the defendant, "after being arrested and advised of his rights, requested the assistance of counsel. Ten minutes later, without having consulted an attorney, he was readvised of his rights, waived them and made a statement because, in the interim, the arresting officer had given him a fuller 'explanation' or 'understanding' by advising him of the strength of the case against him." 408 N.Y.S.2d at 430, 380 N.E.2d at 258.

The court reversed Grant's conviction, noting that even though the questioning of Grant was terminated at his request for counsel and he was taken from the room, "[n]othing . . . was done to assist the defendant in obtaining counsel." After reviewing the case history from *Miranda* to *Mosley*, the New York Court of Appeals found that a defendant's request for counsel must be considered as something different than standing on the right to remain silent, which after a discreet interval, may be met by renewed police attempts to secure a statement. If *Mosley* requires at a minimum that the defendant's right to remain silent be "scrupulously honored," the request for counsel deserves more respect than the continuation of the police efforts to change the suspect's mind:

"In prior decisions we have held that the police cannot be said to have respected the defendant's request for counsel when they simply readvise the defendant of his rights after he has been transported to the station house (*People v. Buxton* [44 N.Y.2d 33, 403 N.Y.S.2d 487, 374 N.E.2d 384 (1978)]), or when they confront him with the tearful mother of a codefendant, although they had previously afforded him an opportunity to attempt to reach an attorney and subsequently readvised him of his rights (*People v. Jackson* [41 N.Y.2d 146, 391 N.Y. S.2d 82, 359 N.E.2d 677 (1976)]). Here

the arresting officer's conduct was completely inconsistent with the defendant's request because he took no steps to afford the defendant an opportunity to obtain an attorney's assistance, and, in fact, immediately made comments which undermined the defendant's decision to consult an attorney. In addition, unlike the circumstances in *Mosley*, here there was no significant break in the interrogation, and no change of parties, place or subject matter of the interrogation (see *Michigan v. Mosley, supra,* 423 U.S. p. 104, 96 S.Ct. 321 [at 326]). In short on this record it cannot be said that the authorities 'scrupulously honored' the defendant's request for counsel before resuming the interrogation and the confession should have been suppressed." 408 N.Y.S.2d at 435, 380 N.E.2d at 263.

The case before us is readily distinguishable from those cases in which a waiver has been found. In *Pheaster*, for example, heavily relied upon by the State, the court made the following comment:

"It is critical to focus on the fact that Pheaster agreed to cooperate with the agents after he had been in the car for only fifteen to twenty minutes—a point not challenged in his brief. Thus, although he was in the car for a longer period, his cooperation was not the result of lengthy incommunicado detention. *This is not a case in which there was an intentional delay in providing an attorney in the hope that the suspect would yield to pressure and recant his demand for an attorney.*" (Emphasis added.) 544 F.2d at 368.

Similarly, in *United States v. Rodriguez-Gastelum, supra,* the court stated:

"We understand that the interrogating officer may not badger the suspect or bring pressure intended to induce a change of mind. Nor can he coerce the suspect into reconsidering an assertion of his right to counsel." 569 F.2d at 488.

It is noteworthy that Monroe's "decision" to retreat from insisting on his right to counsel and his right to remain silent was made at a time when psychologically most

vulnerable to police suggestion. The police had taken him into custody at 6:30 a. m., and from the record presented it appears that he had been without sleep that night. He was taken into custody and according to his mother,

> "his eyes looked real funny, sort of glassy like he wasn't really quite aware of what was going on and when I asked him things sometimes he acted like he didn't quite hear me and I would talk to him say two or three times to him and then he would act like he knew I was talking to him, and he would make some comment but he didn't look like he was really with it."[1]

The police tactics used to dissuade the appellant from standing on his insistence that he not talk without having seen counsel, either alone, or combined with an apparent debilitated mental state of mind, raise insurmountable obstacles to a finding that the appellant's asserted constitutional rights were validly waived.

I would therefore reverse the judgment of conviction and remand for a new trial.

---

1. There was also testimony from a defense psychiatrist that the defendant was probably under the influence of LSD and alcohol at the time the murder was committed, and that he was also under the influence of alcohol at the time the confession was obtained. This may account for the defendant's appearance.