660 P.2d 1336

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Betty Jane MITCHELL, Defendant-Appellant.**

No. 13757.

Supreme Court of Idaho.

Feb. 11, 1983.

Certiorari Denied May 16, 1983.
See 103 S.Ct. 2101.

Douglas Lee VanderBoegh, Pocatello, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

Defendant appeals from a conviction of first degree murder.

Betty Jane Mitchell, the defendant appellant, arrived at her home on the evening of January 23, 1978, and found her husband, "Mitch", dead. Initial investigation indicated that Mitch had been murdered by strangulation during a burglary of their home, but police attention subsequently focused upon Mrs. Mitchell and the possibility that she had arranged to have her husband killed.

On January 31, 1978, Mrs. Mitchell was in Boise, Idaho, and registered at The Boisean Motel. At approximately 12:45 p.m. Lt. Tom Taylor of the Ada County Sheriff's

Office, accompanied by two detectives, contacted Mrs. Mitchell at her motel room and advised Mrs. Mitchell that he wanted to talk to her. Lt. Taylor handed Mrs. Mitchell a printed form that contained *Miranda* rights and an express waiver and requested her to read and complete the form. Mrs. Mitchell then substantially completed the form and signed the waiver, which will be discussed *infra,* and Lt. Taylor began his tape recorded interview. Lt. Taylor did not inform Mrs. Mitchell that he possessed a warrant for her arrest when she was given the *Miranda* rights, nor did he readvise Mrs. Mitchell of her *Miranda* rights when he specifically informed her that she was under arrest.

Additional facts relevant to this appeal are that Mrs. Mitchell had ingested alcohol and prescribed medication prior to and during the interrogation. Before going to her motel room, Lt. Taylor had been advised that Mrs. Mitchell was observed at a bar that morning. Lt. Taylor had also been informed that Mrs. Mitchell took prescribed medication daily. Additionally, Mrs. Mitchell consumed one can of beer and part of another can during the interview. At the completion of the interrogation, during which Mrs. Mitchell made several incriminating statements, Mrs. Mitchell was taken to the sheriff's office and charged with first degree murder.

Although the crime was committed on January 23, 1978, trial was not held until May 19, 1980. In the intervening period, defendant appellant requested and received psychiatric evaluations. Additionally, defendant made several motions to suppress the recorded interrogation or any reference thereto on the grounds that she was incapable of knowingly and voluntarily waiving her *Miranda* rights or of knowingly and intelligently making a voluntary statement. On December 22, 1978, the trial court determined that the question of voluntariness was an issue of fact for the jury. Pursuant

to defendant's appeal by certification under I.A.R. 12, this Court, on April 8, 1980, held that the question of voluntariness is controlled by *State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970), *cert. denied* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971), which established the rule that voluntariness is, in the first instance, a question of law for the trial court.[1] *State v. Mitchell,* 101 Idaho 108, 109, 609 P.2d 175 (1980).

Upon remand, the district court suppressed the entire tape recording and transcription thereof. However, the trial court determined that Mrs. Mitchell's statements did not become involuntary until a point referred to by the parties as approximately one-third of the way into the interview, and the court permitted Officer Taylor to testify concerning the interrogation up to that point. The court suppressed any reference to the interrogation past that point. At the conclusion of trial, the jury returned a verdict of guilty of murder in the first degree, and the court sentenced the defendant to an indeterminate life term. Defendant appeals her conviction.

Defendant appellant presents three principal issues for our review on appeal, none of which involve any claims regarding the sufficiency of the evidence. The issues raised are: (1) Whether the trial court erred by refusing to suppress all reference to the interview with the appellant; (2) whether the trial court erred in denying appellant's motion to dismiss on the ground that the trial court's suppression of the last two-thirds of the interview rendered the showing of probable cause at the preliminary hearing insufficient to bind the appellant over for trial; and (3) whether the trial court erred in denying defendant's motion to dismiss the jury panel as a whole. The alleged errors will be discussed in the order raised by the appellant.

I

On appeal, appellant argues that there are several reasons why the trial court

---

1. In *State v. Dillon, supra,* we adopted the so-called "Massachusetts rule" wherein we held that "the trial court in the absence of the jury resolves the issue of voluntariness and then determines the admissibility of a criminal defendant's statements. The trial court must find them to have been shown to be admissible by a preponderance of the evidence." *Supra* at 709–710, 471 P.2d at 564–65.

erred in refusing to suppress the entire interrogation. Appellant first argues that the *Miranda* warnings given to her were inadequate and that she did not effectively waive those rights. A review of the circumstances surrounding the interrogation at this juncture will facilitate a determination of these arguments.

Testimony elicited at both the preliminary and pretrial hearings, transcripts of which are contained in the record, establish that Lt. Taylor, upon gaining admittance to appellant's motel room, advised appellant that he wanted to talk to her. Lt. Taylor did not inform appellant of the arrest warrant in his possession at that time, but handed her a copy of the rights and waiver form used by the Ada County Sheriff's Office.[2] He requested appellant to read the form and place her initials at the end of each delineated right to indicate that she understood her rights. Lt. Taylor testified that he advised appellant to tell him if she did not understand anything and that he would explain it to her. Lt. Taylor further testified that appellant put on her glasses, read the form and placed her initials after all but one of the rights. The failure to initial the statement regarding her rights to a public defender was brought to appellant's attention, whereupon she responded by placing her signature at the bottom of the form.[3] Lt. Taylor then turned on the tape recorder and began his interrogation. Appellant was not informed of the arrest warrant against her or that she was under arrest until several minutes later in the interview.[4]

The warnings contained in the form given to appellant are not challenged as insufficient under the standards prescribed in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant's challenge is instead directed to the timing of those warnings. In a somewhat novel approach to the *Miranda* question, appellant argues essentially that the warnings were given too early, as opposed to too late or not at all, the usual arguments concerning the timing of giving *Miranda* rights. *See, e.g., State v. McCurdy,* 100 Idaho 683, 603 P.2d 1017 (1979); *State v. Thomas,* 94 Idaho 430, 489 P.2d 1310 (1971); *State v. Sanchez,* 94 Idaho 125, 483 P.2d 173 (1971); *State v. Radabaugh,* 93 Idaho 727, 471 P.2d 582 (1970). Appellant argues that, when viewed under an objective test, the interrogation did not become custodial until she was specifically informed of her arrest.[5] She further contends that since the warnings were not repeated when the interrogation became custodial, the warnings given immediately prior to the commencement of the interview did not effectively protect the defendant's rights against self incrimination, nor comply with the safeguards established in *Miranda v. Arizona, supra.* We disagree.

In *Miranda,* the United States Supreme Court held that in the absence of other fully effective means, the following

2. See Appendix I (*Miranda* form).

3. Appellant's failure to indicate whether she did or did not wish to talk to the officers at that time, in right No. 7, is discussed *infra.*

4. The point in the interrogation at which Mrs. Mitchell learned that she was under arrest is disputed. For some unknown reason the tape recorder stopped at a point approximately five minutes into the interview, and Lt. Taylor later interjected his statement that he informed Mrs. Mitchell of the arrest warrant during this unrecorded period. The state asserts that Mrs. Mitchell learned of the arrest warrant issued against her at this point. Mrs. Mitchell argues that she was not advised of her arrest until a few minutes later. This factual issue was not resolved at trial.

5. We reach no decision concerning when the interrogation became custodial under an objective test. We merely point out the existence of other facts that would be considered in such a determination, including: that Lt. Taylor was accompanied by two other detectives who were introduced as such to appellant but took no active part in the interview; and that appellant was given a *Miranda* rights and waiver form when the officers entered the room.

We note also that appellant ignores the apparent contradiction in her argument that the *entire* interrogation should be suppressed, but that the interrogation was not custodial, and therefore no *Miranda* warnings were even required until she was expressly informed of her arrest.

measures are required procedural safeguards in the event of a custodial interrogation outside the presence of counsel: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07. The instructive phrase in determining the effectiveness of the warnings given to appellant prior to the point in time at which she claims the interrogation became custodial is *"[p]rior to any questioning . . . ."* Lt. Taylor, in attempting to discharge his responsibilities, gave appellant the *Miranda* statement immediately after entering her motel room and prior to any questioning and thereby satisfied the *Miranda* requirements. The fact that appellant was not explicitly informed that the officers had an arrest warrant at the time that she received the warnings does not invalidate their effectiveness. It is not essential that a suspect be informed of the charges against her before being interrogated. *See United States v. Washington,* 431 U.S. 181, 186, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238, 244 (1977); *State v. Lucero,* 151 Mont. 531, 445 P.2d 731, 736 (1968).

■ The *Miranda* warnings given to appellant were substantively sufficient and effectively informed appellant of her rights. It was not necessary that the rights be repeated at the moment in time asserted by appellant to be the point at which the interrogation is alleged to have become custodial, particularly where appellant had been given her rights just five to ten minutes earlier. *See United States v. Paulton,* 540 F.2d 886, 890–91 (8th Cir.1976) (warnings did not have to be repeated where defendant had essentially received the warnings and advice required by *Miranda* a short time earlier).

■ Appellant also argues that she did not effectively waive her *Miranda* rights. The state, in attempting to introduce statements made by a suspect during a custodial interrogation and outside the presence of an attorney, must establish a voluntary, knowing and intelligent waiver of the suspect's rights. *State v. Ybarra,* 102 Idaho 573, 577, 634 P.2d 435 (1981). The state has a heavy burden and must overcome the presumption against waiver. *See State v. Fisk,* 92 Idaho 675, 448 P.2d 768 (1968); *Abercrombie v. State,* 91 Idaho 586, 428 P.2d 505 (1967). Although not conclusive, an express written statement of waiver of *Miranda* rights is usually strong proof of voluntary waiver. *State v. Padilla,* 101 Idaho 713, 719, 620 P.2d 286, 292 (1980); *see North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979).

Appellant executed a written waiver. She alleges, however, that the written waiver was ineffective because she failed to completely fill out the form and initial every right listed, as instructed by Lt. Taylor. In reviewing the waiver of rights form, it is apparent that appellant failed to indicate, by checking or circling "I do/do not," whether she wanted to talk to a police officer at that time. She did, however, place her initials at the end of that sentence. It also appears that appellant did not place her initials after the following delineated right: "I have (read the above) (had the above read to me) and fully understand my right to the services of the public defender at this or any future time." Lt. Taylor testified that he noted appellant's failure to initial the public defender right, that he brought the omission to her attention, and that she then placed her signature at the bottom of the form. He stated that "when she went ahead and signed the bottom, that indicated to me that she fully understood it." Lt. Taylor also testified that he discussed appellant's right to have a public defender or lawyer while she was signing the form. Nevertheless, appellant alleges that the above mentioned deficiencies render the waiver ineffective.

■ The *Miranda* Court, however, did not intend that such mechanical or formalistic approaches be used to evaluate the procedural safeguards given. The safeguards suggested in *Miranda* were intended to create a "practical reinforcement for the

right against compulsory self incrimination." *See Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182, 192 (1974). The question is not one of form, but whether the appellant, in light of the totality of circumstances surrounding her statements, knowingly and intelligently waived her *Miranda* rights. *See North Carolina v. Butler, supra* 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292; *United States v. Carra,* 604 F.2d 1271, 1274 (10th Cir.1979), *cert. denied* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979); *State v. Ybarra, supra; State v. Padilla, supra. Miranda* itself does not require a written or express waiver. *See North Carolina v. Butler, supra* (defendant refused to sign waiver form but willingly made inculpatory statements). Thus, any minor deficiency in the execution of the waiver of rights form will not, in and of itself, invalidate the appellant's express waiver. We must look to the totality of the circumstances to determine whether the trial court correctly determined that appellant knowingly and voluntarily waived her *Miranda* rights.

After completing the waiver of rights form, appellant conversed with and responded to the questions asked of her by Lt. Taylor over a period of approximately two hours. At no time did appellant request the interview to stop, attempt to revoke her written waiver, or invoke her privilege to remain silent, even upon learning that she was under arrest.

Lt. Taylor knew that appellant had been drinking and that she had taken prescription medication. Additionally, he drank a beer with her during the interview. However, he testified, in effect, that defendant was alert and in full possession of her faculties during the interview. On the other hand, two expert witnesses who filed affidavits and later appeared on behalf of the appellant initially expressed opinions in their affidavits that the amount of alcohol and drugs allegedly consumed by the appellant would have affected her ability to competently waive her rights.[6]

▮ The trial court, in an order denying appellant's motion to suppress, dated December 12, 1978, determined that "at the time the waiver was signed by defendant she was in possession of her faculties and that the signing of said waiver was made knowingly and intelligently." The trial court reaffirmed this finding in its order of May 13, 1980, wherein it stated that:

"This Court previously held in its Memorandum of 22 December 1978, that at that time the waiver was signed by defendant, that she was, in fact, in possession of her faculties and that the signing of said waiver was made knowingly and intelligently. No part of the proof at the present [pretrial] hearing has convinced this Court otherwise."

The trial court's conclusions that appellant made a knowing and voluntary waiver of her rights is supported by substantial and competent evidence. Being unpersuaded that the findings were erroneous, we uphold the trial court's conclusions. *See State v. Ybarra, supra* 102 Idaho at 577, 634 P.2d at 439; *State v. Wyman,* 97 Idaho 486, 491, 547 P.2d 531, 536 (1976), *overruled on other grounds, State v. McCurdy,* 100 Idaho 683, 603 P.2d 1017 (1979); *State v. Dillon,* 93 Idaho 698, 707–08, 471 P.2d 553, 562–63 (1970), *cert. denied* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971); *State v. Fisk,* 92 Idaho 675, 679, 448 P.2d 768, 772 (1967).

▮ Appellant next argues that the admission of statements made during the first one-third of the interview constitutes reversible error because she was incapable of knowingly and voluntarily making such statements. We discuss this question separately from the question of waiver because "issues of voluntariness and compliance with *Miranda* are separate constitutional defenses," and "even though a statement may be obtained before *Miranda* warnings are required, or after they are given, the statement may be inadmissible because it was involuntarily given." *United States v.*

---

6. The affidavits of both Dr. McDonald and Dr. Reichman were not entirely consistent with the testimony regarding appellant's state of mind elicited from them at the pretrial hearing. *See* n. 9, *infra.*

*Curtis,* 568 F.2d 643, 647 (9th Cir.1978), *citing Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *People v. Parada,* 188 Colo. 230, 533 P.2d 1121, 1123 (1975); *State v. Gallegos,* 92 N.M. 336, 587 P.2d 1347, 1351 (N.M.App.1978). The question of the voluntariness of the defendant's statements must be resolved by examining the totality of circumstances surrounding the statements to determine whether it is the product of a rational intellect and a free will. *State v. Powers,* 96 Idaho 833, 840, 537 P.2d 1369, 1376 (1975), *cert. denied* 423 U.S. 1089, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976); *see also, United States v. Dufur,* 648 F.2d 512 (9th Cir.1980), *cert. denied* 450 U.S. 925, 101 S.Ct. 1378, 67 L.Ed.2d 355 (1981).

Appellant alleges that as a result of her ingestion of prescription drugs and alcohol prior to and during the interrogation her statements were not the product of a voluntary exercise of free will and should have been suppressed in their entirety. "However, [c]ustodial statements are not *per se* involuntary because of intoxication," *United States v. Brown,* 535 F.2d 424, 427 (8th Cir.1976), and, in accordance with the above stated rule, the totality of circumstances must be examined to determine whether appellant's statements were voluntarily made.

It will be recalled that the trial court, at the behest of this Court, *see State v. Mitchell,* 101 Idaho 108, 609 P.2d 175 (1980), determined the question of voluntariness as a matter of law. Evidence before the trial court established that appellant consumed alcoholic beverages prior to the interview and drank one beer and part of another during the interview. Additionally, appellant took prescription medication on the day of the interview. The trial court considered evidence given by psychiatrists and psychologists, appearing on behalf of both the defendant and the state at the pretrial hearing, that appellant's mental condition deteriorated to a point where she was no longer in control of her faculties. Lt. Taylor, on the other hand, testified to the effect that the defendant was alert and in full possession of her faculties during the entire interview. In its order dated May 13, 1980, the trial court concluded that the state had met its burden of proof that at least the first portion of appellant's statements were voluntarily, knowingly and intelligently made, and that the statements made prior to the time her mental condition deteriorated were admissible. However, the trial court concluded that appellant's condition regressed to a point "that at the time the alleged admissions were made to Captain [Lt.] Taylor, the defendant was not mentally competent and therefore that portion of her statement must be suppressed." The trial court determined the line of demarcation between the statements that were made voluntarily and those that were made involuntarily to be approximately one-third of the way into the interview. Although the tape recording and transcription of the interrogation were suppressed in their entirety, Lt. Taylor was allowed to testify to statements made by the appellant during the first one-third of the interview. Some of appellant's statements contained in the first third of the interrogation linked her to the death of her husband, but did not constitute admissions or a confession.

The question of voluntariness of defendant's statements is, in the first instance, a matter of law to be decided by the trial court for purposes of admission. *State v. Mitchell, supra,* 101 Idaho at 109, 609 P.2d at 176; *State v. Dillon, supra,* 93 Idaho at 709–10, 471 P.2d at 564–65. We find that the trial court's conclusion that approximately the first one-third of the appellant's statements were voluntarily made is sound and we will not disturb that conclusion on appeal.[7]

## II

The second question presented by appellant is whether, after the trial court's sup-

---

7. The trial court's determination that approximately the first one-third of defendant's statements in the interrogation were made voluntarily is supported by the expert testimony elicited at the pretrial hearing, which places the point that appellant "lost control" well beyond the point determined by the trial court.

pression of the last two-thirds of the interrogation, there was sufficient probable cause to proceed to trial. Appellant alleges that the magistrate court relied exclusively on the tape recorded interview in determining the existence of probable cause and that the trial court's suppression of all but the first one-third of the interrogation, which allegedly contained nothing to establish probable cause, invalidated the determination of probable cause.

█ The duty of a magistrate at a preliminary hearing is to "determine whether or not a public offense has been committed and whether or not there is or is not probable or sufficient cause to believe that the defendant committed such public offense." I.C. § 19–804. A magistrate's decision that probable cause exists to bind a defendant over to the district court for trial on the charges against him or her should be overturned only upon a showing that the magistrate abused his discretion. *State v. Owens,* 101 Idaho 632, 636, 619 P.2d 787, 791 (1980); *State v. Horn,* 101 Idaho 192, 195, 610 P.2d 551, 554 (1980).

█ Stripped to its essentials, appellant's argument is that the district court's ultimate determination that some of the evidence relied on by the magistrate court was inadmissible, invalidated the magistrate's determination that probable cause existed at the preliminary hearing stage. I.C.R. 5.1, identical in relevant part to Rule of Criminal Practice & Procedure 5.1 in effect at the time of appellant's trial, provides:

"The finding of probable cause shall be based upon substantial evidence upon every material element of the offense charged; ... [with the exception of certain forms of hearsay evidence].... [I]f at the preliminary hearing the evidence

shows facts which would ultimately require the suppression of evidence sought to be used against the defendant, such evidence shall be excluded and shall not be considered by a magistrate in his determination of probable cause."

Nevertheless, in *State v. Watson,* 99 Idaho 694, 587 P.2d 835 (1978), we held that "[w]here an arrest warrant has been issued without a magistrate's finding of probable cause, the illegality of such an arrest ... does not invalidate a conviction which results from a fair trial of the issue of guilt." *Id.* at 697, 587 P.2d at 838. *See also State v. Alger,* 100 Idaho 675, 603 P.2d 1009 (1979); *State v. Lindner,* 100 Idaho 37, 592 P.2d 852 (1979). Similarly, we hold that even if the magistrate erred in relying on evidence at the preliminary hearing that is ultimately determined to be inadmissible, the error is not a ground for vacating a conviction where the appellant received a fair trial and was convicted, and there is sufficient evidence to sustain the conviction. *See also Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (conviction will not be vacated on the ground that defendant was detained without probable cause determination).

### III

█ Appellant's final assignment of error is that the trial court erred in denying her motion to dismiss the jury panel as a whole. In her brief on appeal, appellant Mitchell argues that since "several prospective jurors brought prejudicial information to light in front of all the members of the jury panel," the motion to dismiss the jury panel, made orally during *voir dire,* should have been granted.[8] Appellant argues that the grounds and means for objecting to an entire jury panel, found in the provisions of I.C. §§ 19–2005 and –2006,[9] are drawn too

---

8. Several prospective jurors expressed concern that appellant's alleged accomplices had been released on technicalities.

9. "19–2005. CHALLENGE TO PANEL—GROUNDS.—A challenge to the panel can be founded only on a material departure from the forms prescribed in respect to the drawing and return of the jury in civil actions, or on the

intentional omission of the sheriff to summon one (1) or more of the jurors drawn."

"19–2006. CHALLENGE TO PANEL—WHEN AND HOW TAKEN.—A challenge to the panel must be taken before a juror is

narrowly and violate various state and federal constitutional provisions relating to appellant's right to trial by an impartial jury.[10]

A challenge to the jury panel as a whole, however, was not the only opportunity available to appellant to excise objectionable jurors from the jury panel. Appellant was entitled to *voir dire* the prospective jurors and challenge individual jurors for cause, *see* I.C. §§ 19–2013 and –2017, or exercise peremptory challenges against individual jurors, *see* I.C. §§ 19–2013 and –2015. Even though apparently dissatisfied with the jury panel, appellant did not challenge any juror for cause nor exercise all of her peremptory challenges. Having failed to exhaust the means available to her to exclude unacceptable jurors, appellant cannot now claim error in the trial court's denial of her motion to dismiss the entire jury panel. *Cf. State v. Bitz,* 93 Idaho 239, 460 P.2d 374 (1969) (failure to challenge juror for cause indicates satisfaction with jury as finally constituted); *State v. Radabaugh,* 93 Idaho 727, 471 P.2d 582 (1970) (defendant cannot claim as error trial court's refusal to grant additional peremptory challenges when failed to exercise all challenges available); *State v. McMahon,* 37 Idaho 737, 219 P. 603 (1923) (where defendant exercises only some of his peremptory challenges, it will be inferred jury is satisfactory); *State v. Fondren,* 24 Idaho 663, 135 P. 265 (1913) (defendant cannot urge as error court's refusal to allow challenge for cause when he does not exercise all peremptory challenges).

Finding no reversible error, we affirm.

DONALDSON, C.J., SHEPARD, J., and McFADDEN, J. (Ret.), concur.

## APPENDIX I

ADA COUNTY SHERIFF'S DEPARTMENT
BOISE POLICE DEPARTMENT

NOTIFICATION OF RIGHTS

NOTIFICATION OF THE RIGHT TO THE SERVICES OF THE PUBLIC DEFENDER

NOTIFICATION OF RIGHTS

Before we ask you any questions, you must understand that you have certain rights under both the Idaho and United States Constitutions. You do not have to talk with us. You have the absolute right to remain silent. Anything you say can and will be used against you in court. You have the right ot talk with a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have the right to the advice of a lawyer even if you cannot afford to hire one. You have the right to request the services of the Public Defender at any time if you cannot afford to hire a lawyer. If you want a lawyer present or if you wish to consult a lawyer, you have the absolute right to remain silent until he is present or has been consulted, whether he be the Public Defender or counsel of your own choosing. If you wish to answer questions now, without a lawyer present, you have the right to stop answering questions at any time and remain silent.

WAIVER

(Place initials at the end the each statement below only after you completely understand what such statement means.)

I have read the above statement of my rights  (I have had the above statement of my rights read to me) and understand that:

1.  I have the absolute right to remain silent.

2.  Anything I say can and will be used against me in court.

3.  I have the right to the advice of a lawyer before answering any question.

4.  I have the right to have a lawyer present during any questioning.

sworn, and must be in writing, and must plainly and distinctly state the facts constituting the ground of challenge."

The provisions of I.C. § 19–2006 are mandatory. *See State v. Scoble,* 28 Idaho 721, 155 P. 969 (1916) (construing then effective R.C. § 7820).

10. Appellant argues that the Idaho statutes violate the sixth and fourteenth amendments of the United States Constitution, and Art. 1, § 7, and Art. 5, § 13, of the Idaho Constitution.

5. I have the right to a lawyer even if I cannot afford one, and if I cannot afford one, I may use the service of a Public Defender at any time. _B.J.M._

6. If I choose to answer any questions without the advice of a lawyer or without a lawyer being present, I have the right to stop answering questions at any time and remain silent. _B.J.M._

7. Having these rights in mind, I (do) (do not) wish to talk to Law Enforcement Officers now. _B.J.M._

NOTIFICATION OF THE RIGHT TO THE SERVICES OF A PUBLIC DEFENDER

You have the right to be represented by a lawyer at any time. If you cannot afford a lawyer of your own choosings, you have the right, at public expense, to use the services to the Public Defender. This right may be exercised at any time.

WAIVER

(Place initials at the end of the acknowledgement statement only after you completely understand what the statement means.)

I have (read the above) (had the above read to me) and fully understand my right to the services of the Public Defender at this or any future time. _____

SIGNED: _Betty J. Mitchell_

PLACE: _____

DATE: 1/31/78   TIME: 12:50 P.M.

—WITNESS— _Sgt. Tom L. Taylor_

—WITNESS— _David Sikkuss_

EXHIBIT #1 State FOR IDENTIFICATION

EXHIBIT #1 State

JUDGE

ACS/BPD      0003

---

BISTLINE, Justice, dissenting.

The Court's opinion opens with the concession that Lt. Taylor did not inform Mrs. Mitchell that he possessed a warrant for her arrest. This is true; he did not. More than that, however, he entered the privacy of her motel room for the very purpose of arresting her, and it was in this isolated environment that the interrogation took place—one middle-aged woman in varying degrees of drug and alcohol-induced incompetence vs. three skilled uniformed police officers.

For certain their beforehand knowledge that she had been drinking earlier in the day and their on-the-scene observation of her demeanor suggested to them that the opportunity to interrogate should not be ignored. A majority of the Court says that her confession was voluntarily given be-cause she was both given the *Miranda* warnings orally and signed an acknowledgement of the written *Miranda* warnings. The majority devotes considerable time to the "novel approach" that she was so warned "too early," but the majority shows little concern as to whether her voluntary waiver of the *Miranda* rights was intelligently and knowingly given where she was not further warned that a warrant for her arrest had issued, that it was then and there in possession of the officers, and that she was no longer free to move about—in short, that she was in custody. [This is to say nothing of the rights statutorily accorded to her by the Idaho legislature acting at the invitation of the *Miranda* Court, concerning which more will appear further on.]

Against the foregoing backdrop of non-disclosure the majority finds no merit in her

arguments that statements made by her under such circumstances were inadmissible in evidence. Trial lawyers will see that this case bears a strong resemblance to *State v. Monroe,* 101 Idaho 251, 611 P.2d 1036 (1980), wherein that defendant insisted on having an attorney, but later submitted to interrogation. This Court affirmed, holding that the confession obtained at the ensuing interrogation was voluntary, although one dissenting member of the Court saw the issue not simply as one of waiver, but of a waiver made "voluntarily, knowingly and intelligently" (*Miranda v. State of Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)), Bistline, J., 101 Idaho at 260, 611 P.2d 1036. The issue in *Monroe* primarily centered around "voluntarily."[1] Here, with Mrs. Mitchell, the issue is more central to "knowingly and intelligently." Such is the crux of the real issue which should be but is not this day decided. This Court recently had occasion to be concerned with "knowingly and intelligently," but such was in a different context, for which reason it may be assumed that the majority of the Court will not consider that which it said short months ago.[2] Essentially, what the Court does is place its stamp of approval on the practice of hip-pocketing an arrest warrant in order to compromise an unsuspecting and uninformed defendant.

Of the fact that Mrs. Mitchell was defendant in a felony criminal action there can be no doubt. I mention this because *Miranda,* to the teachings of which I will next turn, is in many places couched in terms of the rights of an "individual" and not the rights of a "defendant" or of an "accused person." The Pocatello police had laid their evidence of Mrs. Mitchell's alleged guilt before a neutral and detached magistrate, and that magistrate found probable cause to issue a warrant for Mrs. Mitchell's arrest on a charge of first degree murder.

From that point on she was a defendant, and a *wanted* defendant at that. Any peace officer possessed of such knowledge was obligated to seize her and take her before the nearest magistrate, a point of Idaho law to which I shall also later return.

In *Miranda* is found language which, insofar as federal law is concerned, tells the state courts what is required to substantiate a holding that a defendant's rights have been "knowingly and intelligently" waived. We begin our lesson by observing this passage:

> "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.*"

384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (emphasis added).

At another place in its opinion the *Miranda* Court used the same language in discussing interrogation which takes place after proper warnings are given and the right to counsel is declined by the defendant whom the police are about to question:

> "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant *knowingly and intelligently* waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. State of Illinois,* 378 U.S. 478, 490, n. 14 [84 S.Ct. 1758, 1765, n. 14, 12 L.Ed.2d 977]."

384 U.S. at 375, 86 S.Ct. at 1628 (emphasis added).

That the warnings must be *effective* is then noted in *Miranda* where it speaks of the

---

1. The judgment of the Supreme Court was vacated for reconsideration by the Supreme Court of the United States. 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 385 (1981). Thereafter another opinion was issued reversing the district

court. *State v. Monroe,* 103 Idaho 129, 645 P.2d 363 (1982).

2. *State v. Birrueta,* 98 Idaho 631, 570 P.2d 868 (1977), hereinafter discussed.

interrogation of the three defendants whose appeals were there examined:

"In none of these cases was the defendant given *a full and effective warning* of his rights at the outset of the interrogation process."

384 U.S. at 445, 86 S.Ct. at 1612 (emphasis added).

"Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.[3] In order to combat these pressures and to

3. The *Miranda* Court also concerned itself with modern techniques of interrogation, and its discussion is directly applicable to the interrogation of Mrs. Mitchell, who was an accused defendant confronted by three police officers in the isolation of a motel room, a definite psychological advantage to the police officers, if we are to accept

"that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have *stated before,* 'Since *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.' *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). Interrogation still takes place in privacy. *Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms.*"

384 U.S. at 448, 86 S.Ct. at 1614 (emphasis added).

"The officers are told by the manuals that the 'principal psychological factor contributing to a successful interrogation is *privacy* —being alone with the person under interrogation.' The efficacy of this tactic has been explained as follows.

" 'If at all practicable, *the interrogation should take place in the investigator's office or at least in a room of his own choice.* The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.' "

384 U.S. at 449–50, 86 S.Ct. at 1615 (emphasis added) (footnote omitted).

"The *examiner is to concede him the right to remain silent.* 'This usually has a very undermining effect. First of all, he is disappointed in his expectation of an unfavorable reaction on the part of the interrogator. Secondly, a *concession of this right* to remain silent *impresses the subject with the apparent fairness* of his interrogator.' "

384 U.S. at 453–54, 86 S.Ct. at 1617 (emphasis added) (footnote omitted).

"From these representative samples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear. In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. *The police then persuade, trick, or cajole him out of exercising his constitutional rights.*"

384 U.S. at 455, 86 S.Ct. at 1617 (emphasis added) (footnote omitted).

I seriously doubt that any member of this Court or of any court would venture to suggest that this was not an in-custody interrogation. The focus of suspicion had long since been relegated to the past. Mrs. Mitchell was a *criminal defendant.* She was isolated when confronted, and no matter what the degree of her competence, she was not adequately informed of her defendant status nor of the reason why she was being visited. This indeed was the psychological technique of interrogation which the *Miranda* court deplored, and the evils of which it sought to correct.

permit a full opportunity to exercise the privilege against self-incrimination, the accused must be *adequately and effectively apprised of his rights* and the exercise of those rights must be fully honored."

384 U.S. at 467, 86 S.Ct. at 1624 (emphasis added).

Part III of the *Miranda* opinion concluded with the caveat that the waiver, despite its appearance of being voluntary, must be "knowingly and intelligently" given:

"After such warnings have been given, and such opportunity afforded him, *the individual may knowingly and intelligently waive these rights* and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against .him."

384 U.S. at 479, 86 S.Ct. at 1630 (emphasis added).

Such was but a reiteration of the earlier statement, excerpted from *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962):

" 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but *intelligently and understandingly* rejected the offer. Anything less is not waiver.' "

384 U.S. at 475, 86 S.Ct. at 1628 (emphasis added).

In discussing the deleterious effect that isolated and unfamiliar settings have on proposed interrogatees, as to defendants *Stewart* (California) and *Miranda* (Arizona), mentioned is that "[i]n other settings, these individuals might have exercised their constitutional rights. In the incommunicado police-dominated atmosphere, they succumbed." 384 U.S. at 456, 86 S.Ct. at 1618. The Court unmistakably saw the need for appropriate safeguards at the outset, and further that statements given will be the product of the interrogatee's free choice:

"In each of the cases, the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures. The potentiality for compulsion is forcefully apparent, for example, in *Miranda,* where the indigent Mexican defendant was a seriously disturbed individual with pronounced sexual fantasies, and in *Stewart* [*California v. Stewart,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694], in which the defendant was an indigent Los Angeles Negro who had dropped out of school in the sixth grade. To be sure, the records do not evince overt physical coercion or patent psychological ploys. *The fact remains that in none of these cases did the officers undertake to afford appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice.*

"It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice."

384 U.S. at 457–58, 86 S.Ct. at 1618–19 (emphasis added) (footnote omitted).

Thereafter, the *Miranda* Court, in discussing its earlier *Escobedo* decision, again in connection with the defendant's choice to or not to speak to the police equated "competently" with "intelligently," and said that a decision to speak could not be an independent decision if not made "knowingly or competently":

"Our holding [in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977

(1964)] stressed the fact that the police had not advised the defendant of his constitutional privilege to remain silent at the outset of the interrogation, and we drew attention to that fact at several points in the decision, 378 U.S. at 483, 485, 491, 84 S.Ct. at 1761, 1762, 1765. This was no isolated factor, but an essential ingredient in our decision. The entire thrust of police interrogation there, as in all the cases today, was to put the defendant in such an emotional state as to impair his capacity for rational judgment. The abdication of the constitutional privilege—the *choice on his part to speak* to the police—*was not made knowingly or competently* because of the failure to apprise him of his rights; the compelling atmosphere of the in-custody interrogation, and *not an independent decision on his part,* caused the defendant to speak."

384 U.S. at 465, 86 S.Ct. at 1623 (emphasis added).

There should be little doubt that the high Court has made it abundantly clear that that which appears to be a voluntary waiver of a fundamental constitutional right is not a waiver unless the prosecution demonstrates that it is made intelligently and knowingly, or, competently and knowingly, or, intelligently and understandingly; intelligently thus equates with competently and knowingly equates with understandingly. The interchange of words presents no problem. *Miranda* makes it clear that waiver is virtually synonomous with a "relinquishment of the privilege" of remaining silent and declining to be interrogated. 384 U.S. at 476, 86 S.Ct. at 1629. But the relinquishment must be voluntary in order to be effective, and to be voluntary the Court requires that a defendant's submission to interrogation be an independent decision which is the product of his free choice. From *Miranda* we learn that there is no difference between the defendant's consent to be interrogated and the defendant's waiver of his right to not be interrogated.

Either path arrives at the same destination. As noted in an excerpt above, an individual who has answered some questions, may thereafter desist, and there must be no further inquiries until and unless he *"consents to be questioned."* 384 U.S. at 445, 86 S.Ct. at 1612. Whether spoken of in terms of "consent to be questioned," or intelligently and understandingly made voluntary waiver of constitutional privileges, or relinquishment of the privilege, the end result must be the same. It is not enough to go through the litany of reciting the *Miranda* warnings, nor will it suffice to obtain a signature to a written version of those warnings. The waiver or relinquishment of the privilege afforded by the fifth amendment, or, alternatively put, the consent to be interrogated, must be the individual's intelligently and knowingly made independent free choice. In order to so make that choice, the defendant must be given "a full and effective warning of his rights at the outset . . . ." 384 U.S. at 445, 86 S.Ct. at 1612. "[T]he accused must be *adequately and effectively* apprised of his rights . . . ." 384 U.S. at 467, 86 S.Ct. at 1624 (emphasis added). The *Miranda* warnings are not required to be given for the simple-minded purpose of educating the defendant that he has these constitutional rights, but the

> "warning is needed *in order to make him aware* not only of the privilege, but also *of the consequences of forgoing it.* It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege."

384 U.S. at 469, 86 S.Ct. at 1625 (emphasis added).

Can it seriously be urged that Mrs. Mitchell, who was not properly arrested as the law requires, and who was ignorant of the fact that she stood formally accused of first degree murder, was fully, effectively, and adequately made aware of the consequences of foregoing her constitutional right and privilege to remain silent? Can it be said that she knowingly and intelligently waived

and relinquished her constitutional rights when she was not warned that a magistrate had ruled that the evidence presented against her was sufficient to establish probable cause? Was she adequately, effectively, and fully warned that she was at the time of the interrogation actually in custody and restrained of her freedom? To all three questions the answer is no, to which must be added that both the spirit and the letter of *Miranda* were violated that day.

Obviously, Mrs. Mitchell's arresting officers, who held off making the arrest until they first plied their wiles upon her, would not have expected any success in interrogating her if in compliance with the law they had made the arrest which would have informed her that she stood charged with first degree murder. While one cannot fault their endeavor, the fact still remains that she was entitled to a full disclosure so that she could make the "independent decision" which the *Miranda* Court declares to be essential, and which must be "truly the product of free choice." When Mrs. Mitchell consented to be interrogated, not only did she not know that she had been charged with first degree murder, but she was purposefully kept ignorant. A person who is so led to believe that she is helping the police in their investigation of her husband's death may be expected to and will cooperate with the law, but if that person is made aware that the officers are in fact there to arrest her on a first degree murder charge, in 99 cases out of 100, assuming competence, that person is going to want an attorney and all of the procedural safeguards afforded by the federal and state constitutions. The police knew it. Everyone knows it.

Recently, a unanimous Idaho Court full well understood that the surrender or waiver of constitutional rights must be obtained from an accused who makes his decision knowingly and intelligently, as well as voluntarily. Thus, in *State v. Birrueta,* 98 Idaho 631, 570 P.2d 868 (1977), there was no suggestion of the element of coercion where defendant entered a voluntary plea of guilty to second degree murder charges. The sole issue on appeal was the claim that Birrueta did not knowingly and intelligently understand the charges to which he had pled guilty. He had counsel, and obviously knew that he was charged with killing two men. In reversing the conviction entered on the guilty plea, this Court relied upon *Henderson v. Morgan,* 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), where the Supreme Court recognized that a *plea* (waiving a constitutional right), to which may be added a *waiver* (relinquishing a constitutional right), must be "voluntary in a constitutional sense."

> "And clearly the plea could not be voluntary in the sense that it constituted an *intelligent* admission that he committed the offense *unless the defendant received 'real notice of the true nature of the charge against him,* the first and most universally recognized requirement of due process.' *Smith v. O'Grady,* 312 U.S. 329, 334, 61 S.Ct. 572, 574, 85 L.Ed. 859." *Henderson v. Morgan,* 426 U.S. 637, 645, 96 S.Ct. 2253, 2257–58, 49 L.Ed.2d 108 (1976).

Unlike the defendant in the *Henderson* case, Mrs. Mitchell was kept in. *total ignorance* of the charges against her, or even that any charges had been made. So kept uninformed, it is not surprising that she signed the waivers. Even in the less restrictive civil field of the law, it seems to be the general law that ignorance of a material fact negatives waiver. 28 Am.Jur.2d *Estoppel and Waiver* § 158 (1966).

Case law relied upon by the majority is poor footing indeed. *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), is readily distinguished. The defendant there was a witness before a federal grand jury—a far cry from "interrogation conducted by isolating the suspect with police officers." 97 S.Ct. at 1819 n. 5. Not only was Mrs. Mitchell isolated with police officers, but they alone knew that she was detained—and hence in custody.

*State v. Lucero*, 151 Mont. 531, 445 P.2d 731 (1968), is even more quickly put aside. A case which predated the "voluntary in the constitutional sense" language of *Henderson,* relied upon in *Birrueta,* the facts there were markedly different. There the defendant not only had been placed under arrest, but was taken into custody, and put in a jail cell. She was interrogated by the deputy sheriff who said she was "under the influence of alcohol" two and one-half hours before he went to her cell, who "awakened her with some difficulty," *orally* gave her the *Miranda* warnings, and obtained a written waiver. 445 P.2d at 733. Although the stupefied condition of that defendant was not given any consideration— contrasted to the more enlightened approach of the trial court here—the Montana court saw little problem as to whether the waiver was made "voluntarily, knowingly, and intelligently," mentioned briefly at page 735 of 445 P.2d, noting only that she was in jail and informed that she was charged with assault.[4] The facts and circumstances of the Montana case are interesting—as are the divergent points of view expressed in the two opinions—but nothing more. The *Lucero* defendant was charged; she was in jail. Mrs. Mitchell, on the other hand, was not informed that she had been formally charged with murder. *This* is a difference—not a distinction.

Can it be said that police officers sent to make an arrest, and knowing of the formal charge[5] of murder upon which their warrant is based can go through the *Miranda* litany, withhold the arrest, and thereafter stand on the waiver which has been obtained from a not wholly informed person? Not under federal law, and I would think not under Idaho law as well.

The *Miranda* Court opened its monumental decision with this language:

"We start here, as we did in *Escobedo,* with the premise that our holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings. We have undertaken a thorough re-examination of the *Escobedo* decision and the principles it announced, and we reaffirm it. That case was but an explication of basic rights that are enshrined in our Constitution—that 'No person . . . shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall . . . have the Assistance of Counsel'—rights which were put in jeopardy in that case through official overbearing. These precious rights were fixed in our Constitution only after centuries of persecution and struggle. And in the words of Chief Justice Marshall, they were secured 'for ages to come, and . . . designed to approach immortality as nearly as human institutions can approach it.' *Cohens v. Virginia,* 6 Wheat, 264, 387 [5 L.Ed. 257] (1821)."

384 U.S. at 442, 86 S.Ct. at 1611.

Insofar as most of the western states are concerned, and Idaho for certain, the *Miranda* holding was not an innovation. Whereas other states had been rather backward, particularly with providing counsel to indigent defendants accused of felonies, Idaho was not behind, other than that our state law did not require appointment of counsel until *after* the preliminary hearing. Even prior to *Miranda* some enlightened prosecutors and magistrates were, in fact, providing counsel to indigent felony defendants even prior to the preliminary hearing—notwithstanding that statutory law did not then require it. Near the close of part III of *Miranda,* the Court declared that the basic procedural safeguards it that day mandated

---

**4.** Justice John C. Harrison's dissent saw the facts more realistically:

   "To take a statement from an obviously drunk, confused and semi-literate woman of Mexican descent who had been arrested several hours before and allowed two hours of sleep and awakened and told of her widow-

hood violates, to say the least, the spirit if not the substance of *Miranda.*"
*State v. Lucero,* 151 Mont. 531, 445 P.2d 731, 738 (1968).

**5.** This element was not present in either the *Lucero* or *Washington* case.

must be employed and would be required, leaving to the states the adoption of "other fully effective means" to protect the privilege. 384 U.S. at 479, 86 S.Ct. at 1630. *Miranda* came in 1966. Idaho responded immediately. The 1967 legislature made the first substantial additions to the Criminal Code since the Criminal Practice Act of 1864—all of which reflect Idaho's acceptance of *Miranda* dictates, and some of which went beyond in spelling out the ways constitutional rights will be protected. So far as I can ascertain, these statutes have gone virtually unheeded. Adherence to the Idaho statutory procedures, both of great age and of 1967, would have prevented the arising of the controversy we pass upon today. I touch upon those which are applicable; others are solicitous of the protections to be afforded indigents.

I.C. § 19–507 sets forth the requirements of arrest warrants. Included is that the peace officer to whom it is directed or into whose hands it comes, is "commanded *forthwith* to arrest" the accused and take the accused to the issuing magistrate or the nearest or most accessible magistrate. I.C. § 19–508 requires that the arrest warrant "state the offense charged." I.C. § 19–515 states that the accused (defendant) must be taken before the magistrate "without unnecessary delay." I.C. § 19–608 requires that "[t]he person making the arrest must inform the person to be arrested of his intention to arrest him, *of the cause of the arrest, and the authority to make it ....*"

I.C. § 19–801 requires an arrested person taken before a magistrate to be "immediately informed ... of the charge against him, and of his right to the aid of counsel in every stage of the proceedings." I.C. § 19–802 requires the magistrate to "allow the defendant a reasonable time to send for counsel" and further that upon defendant's request the magistrate shall "require a peace officer to take a message to any [local] counsel ... the defendant may

name." I.C. § 19–853(a)(1), in unequivocal terms, mandates that where a person is under formal charge of having committed a serious crime, and is not represented by an attorney under conditions in which a person having his own counsel would be entitled to be so represented, the law enforcement officers are required to clearly inform such person of his right to counsel and of the right of a needy person to be represented by an attorney at public expense. Section 19–853(a)(2) mandates that if the person so formally charged or so detained does not have an attorney, the officers must notify the public defender or trial court concerned, as the case may be, that he is not so represented.

Faithful compliance with these mandatory requirements of the law—all of which were enacted to fulfill constitutional requirements, some in early days and some responsive to the *Miranda* decision, would have allowed Mrs. Mitchell to intelligently and knowingly make her independent decision, of a free will, to consent to be interrogated. An intelligent decision is not based upon mental capacity, but upon being fully informed as to rights and consequences; it is a decision *made* intelligently, by whomever and with whatever mental endowment, with full knowledge of all the circumstances. Mrs. Mitchell was not only kept uninformed by the officers, but also suffered from varying degrees of incompetency, as found by the conscientious trial judge in his effort to ascertain at what point they went too far in that respect.

While it is understood that officers in the field may not fully comprehend *Miranda,* there is no excuse for their noncompliance with Idaho criminal statutes, compliance with which would provide the *Miranda* protections.[6]

---

6. Recently at oral argument in another case inquiry was made of deputy attorney general as to the views of the office of the attorney gener-

al in requiring police officers of this state to comply with the statutory law:

"FROM THE BENCH: Would you use some of that time to comment upon this

proposition that I discussed briefly with Mr. Kofoed, that for 15 years now we've had statutes on the books here in Idaho which. I think were enacted pursuant to the *Miranda* case which reflects the legislature's sense at the time they passed it that these *Miranda* warnings be in writing, and before an interrogation takes place that there be some attempt made to get the interrogee to sign the thing and acknowledge that he's well informed and that in the absence thereof that there be something written down by the officer explaining that this took place but he didn't sign it.

"DEPUTY ATTORNEY GENERAL: I acknowledge that statute does exist. I don't believe that there is anything that says that noncompliance with that statute automatically makes any statement not admissible.

"BENCH: Well, let me put it to you this way. Do you think that it's wrong to come to the conclusion that that statute was the legislature's sense of what the *Miranda* court said was a constitutional requirement?

"DEPUTY ATTORNEY GENERAL: I'd need to do some research on that before I'd reach any conclusion on it. That's a possibility, but I would not agree to that without being able to do the research on it.

"BENCH: You think it's just so much surplusage in the Idaho Code?

"DEPUTY ATTORNEY GENERAL: No, I wouldn't say it's surplusage. I would suspect that it was probably brought at the instigation of defense attorneys, the Idaho

trial lawyers or something. But, I don't know . . .

"BENCH: It wouldn't make any difference who asked for the legislation, if the legislature passed it and said to the law officers, which they've done since 1864, this is how you make an arrest and now this is how you conduct an interrogation.

"DEPUTY ATTORNEY GENERAL: Unless it says that unless you comply with all of these all of your further action is not admissible into court, that would not make the admission or statement inadmissible in court. I'm not sure that is a consequence of not complying with that statute.

"BENCH: So what you're saying is, to the law officers throughout the state of Idaho, it's optional. If they want to do it that way, it's fine.

"DEPUTY ATTORNEY GENERAL: If they were asking me for advice, I'd say 'You follow the statute.' What I'm saying to the Court today is I don't believe that it is mandatory to follow those in order to make the statement admissible into court.

"BENCH: If you're saying it to the Court, you're also saying it to the people, to the law enforcement.

"DEPUTY ATTORNEY GENERAL: Not if they are asking me for advice. We could say, 'yes, you did it wrong, but yet it is still going to be admissible.' . . ."